## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

MARQUIS DOMINICK, BRETT RIOS, ALEX HICKMAN, TASHARI SELLERS, RAYMOND SCHWAB, JESSE FRIEDMAN, SUSAN McKILLIPS, RYAN KEHOE, ADAM BENTCH, PATRICIA KOO, ISIS USBORNE, KRISTEN KLOTZER, and JOE SZUSZWALAK

      Plaintiffs,

v.

THE CITY AND COUNTY OF DENVER, a municipal entity;
CHIEF OF POLICE PAUL PAZEN, in his individual capacity,
PATRICK PHELAN, in his individual capacity;
JOHN & JANE DOES 1-100, in their individual capacities.
      Defendants.

---

## COMPLAINT AND JURY DEMAND

---

      Plaintiffs, Marquis Dominick, Brett Rios, Alex Hickman, Tashari Sellers, Raymond Schwab, Jesse Friedman, Susan McKillips, Ryan Kehoe, Adam Bentch, Patricia Koo, Isis Usborne, Kristen Klotzer, and Joe Sazuszwala, by and through their attorney, E. Milo Schwab of Ascend Counsel, LLC, respectfully allege for their Complaint and Jury Demand as follows:

## INTRODUCTION

      Over the course of eight days in the spring of 2020, the Denver Police Department engaged in a campaign of retribution against protesters who marched and chanted, calling for an end to police brutality and racism. Throughout this incredible showing of civic engagement, Denver police officers repeatedly shot rubber bullets and tear gas canisters at the faces of protesters. Their apparent goal was to inflict maximum pain. Striking at least fifteen people in the head, the Denver

1

Police took the eyes of two individuals. For Michael Driscoll, the price that Denver police officers demanded for his calls for reform was a shattered skull.

## JURISDICTION AND VENUE

1.     This action arises under the Constitution and laws of the United States, and is brought pursuant to Title 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331. Jurisdiction supporting Plaintiffs' claims for attorney fees and costs are conferred by 42 U.S.C. § 1988.

2.     Venue is proper in this District according to 28 U.S.C. § 1391(b) because the events giving rise to the claims occurred in this District and all Defendants reside in this District

## PARTIES

3.     Plaintiff Marquis Dominick is a citizen of the United States and a resident of the state of Colorado and was during the relevant times described herein.

4.     Plaintiff Brett Rios is a citizen of the United States and a resident of the state of Colorado and was during the relevant times described herein.

5.     Plaintiff Alex Hickman is a citizen of the United States and a resident of the state of Colorado and was during the relevant times described herein.

6.     Plaintiff Tashari Sellers is a citizen of the United States and a resident of the state of Colorado and was during the relevant times described herein.

7.     Plaintiff Raymond Schwab is a citizen of the United States and a resident of the state of Colorado and was during the relevant times described herein.

8.      Plaintiff Jesse Friedman is a citizen of the United States and a resident of the state of Colorado and was during the relevant times described herein.

9.      Plaintiff Susan McKillips is a citizen of the United States and a resident of the state of Colorado and was during the relevant times described herein.

10.     Plaintiff Ryan Kehoe is a citizen of the United States and a resident of the state of Colorado and was during the relevant times described herein.

11.     Plaintiff Adam Bentch is a citizen of the United States and a resident of the state of New York and was during the relevant times described herein.

12.     Plaintiff Patricia Koo is a citizen of the United States and a resident of the state of New York and was during the relevant times described herein.

13.     Plaintiff Isis Usborne is a citizen of the United States and a resident of the state of Hawaii and was during the relevant times described herein.

14.     Plaintiff Kristen Klotzer is a citizen of the United States and a resident of the state of Colorado and was during the relevant times described herein.

15.     Plaintiff Joe Sazuszwala is a citizen of the United States and a resident of the state of Colorado and was during the relevant times described herein.

16.     Defendant City and County of Denver is a municipality in the state of Colorado. The Denver Police Department (DPD) is a subdivision of the City and County of Denver.

17.     At all times pertinent to the subject matter of this litigation, Defendant Paul Pazen was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant Pazen was acting under color of state law in his capacity as Chief of Police of Denver. Defendant Pazen was responsible for supervising Defendants John

& Jane Does 1-100 and directing their actions during the protests in response to the murder of George Floyd.

18.    At all times pertinent to the subject matter of this litigation, Defendant Patrick Phelan was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant Phelan was acting under color of state law in his capacity as Commander of Special Operations for the Denver Police Department. In this role, Defendant Phelan was in direct command of the officers responding to the George Floyd protests. Defendant Phelan was responsible for supervising Defendants John & Jane Does 1-100 and directing their actions during the protests in response to the murder of George Floyd.

19.    At all times pertinent to the subject matter of this litigation, Defendants John & Jane Does 1-100 were citizens of the United States and residents of and domiciled in Colorado. At all times pertinent, Defendants John & Jane Does 1-1-0 were acting within the scope of their official duties and employment and under color of state law in their capacities as law enforcement officers employed by the DPD or the Denver Sheriff's Department.

## FACTUAL ALLEGATIONS

20.    George Floyd was murdered on May 25, 2020.

21.    Minneapolis police officers arrested Mr. Floyd, a 46-year-old Black man, after a convenience store employee called 911 and told the police that Mr. Floyd had bought cigarettes with a counterfeit $20 bill. Those officers pinned Mr. Floyd to the ground. Then one officer, Derek Chauvin, put his knee on Mr. Floyd's neck. He would choke Mr. Floyd for eight minutes and forty-six seconds while Mr. Floyd repeatedly told him

that he couldn't breathe; while numerous other officers callously looked on and did absolutely nothing; while bystanders pleaded for Officer Chauvin to stop killing Mr. Floyd; while Officer Chauvin mocked Mr. Floyd. Among Mr. Floyd's final words were "please, please, please, I can't breathe." He would die in the street under the knee of his oppressor.

22.     Mr. Floyd's death was emblematic of the racist system of policing in the United States of America. Officers know that they can violate the law, and constitution, with impunity, and particularly when the victim of their abuse is a person of color. Fellow officers will do nothing more than stand by and watch. And, when someone complains, the police department, police union, and local prosecutors and politicians will circle the wagons in defense of a murderer, simply because he wears a badge and a gun.

23.     Mr. Floyd's murder, and this system, sparked millions of people to gather across this nation, and world, to mourn and to call for reform of our modern policing.

24.     Denver was among the cities where there was a strong reaction to Mr. Floyd's death with thousands taking to the streets in protest.

25.     Mr. Floyd's murder hit home for Denverites because of Denver law enforcement's repeated murder and brutalization of people of color without consequence, and its history of racist policing. In Denver, there has been George Floyd after George Floyd. From Marvin Booker to Michael Marshall, Denver law enforcement officers have murdered with near impunity. The officers who murdered these Black men still patrol the streets and jails of Denver.

26.     Denver's racist policing is borne out by statistics. Denver law enforcement officers disproportionately use force against Black people. While only 10% of Denver's

population is Black, 27% of the use of force incidents in Denver are perpetrated against Black people.

27.     Protesters in Denver held signs, and chanted names, relating to this long, sordid history of police brutality against Black men. Protesters called for an end to the racist policing that Denver has condoned for decades. Those at the protests voiced their disgust with Denver's lawless law enforcement officers.

28.     Denver Police officers responded as counter-protesters – punishing those calling out police violence. Denver Police used the force of the state to retaliate against thousands calling for a more just policing system.

29.     This protest against police brutality was met with the very thing it was protesting.

**Denver Police Targeted Journalists and those Attempting to Record DPD's Violent Behavior During the George Floyd Protests.**

30.     Throughout the Denver George Floyd protests, Denver police officers targeted accredited members of the press along with a multitude of individuals seeking to record police conduct.

31.     Time after time, they shot at individuals recording, seeking to limit the opportunity for those outside the protests to see their actions.

32.     And as we have seen over the past decade, the filming of police officer's using excessive force has played a critical role in building a movement to stem the worst abuses.

33.     On May 28, 2020, while he was covering the protests at the State Capitol, Hyoung Chang, a credentialed press photographer for *The Denver Post*, was struck two times by pepper-ball rounds fired by law enforcement personnel. One round cut Chang's arm.

The other shattered his press badge that was hanging around his neck. Mr. Chang was quoted after the event as saying, "If it was one shot, I can say it was an accident. I'm very sure it was the same guy twice. I'm very sure he pointed at me."



*Hymoung Chan's arm after being shot*



*Mr. Chan's press badge*

34.    On May 29, 2020, a DPD officer shot Andy Sannier in the chest with a rubber bullet without warning during the protests. Mr. Sannier was walking home downtown that evening, when he saw a Black man yelling at, but not threatening, officers. A white couple started arguing with the Black man who was yelling at the officers. Mr. Sannier stopped and recorded this with his cell phone from a comfortable distance. DPD officers opened fire on the people arguing, and, seeing that Mr. Sannier was filming, shot him in the chest with a pepper ball.

35.    On May 29, 2020, John Cameron attended the George Floyd protests in Denver in order to record footage as a member of the press. When DPD officers noticed him recording, and without warning, officers started firing pepper balls and rubber bullets. He turned and ran and they continued firing at him, hitting him in the back.

36.    On May 29, 2020, at approximately 8:15 p.m., a credentialed cameraman for KMGH-TV/Channel 7, was struck four times in the chest by rubber bullets fired by DPD officers. Officers also fired paintballs, hitting the front lens of his conspicuous professional-grade video camera, which was at head level when DPD officers fired on him.

37.    On May 30, 2020, Timmy Lomas was attending the Denver George Floyd protests. Mr. Lomas was filming the front line of the protests, in particular, an incident involving a man injured by a flash-bang grenade fired by the Denver Police. While he was filming, another DPD officer pepper-sprayed Mr. Lomas directly in the face. Mr. Lomas had committed no crime, was not resisting arrest, and was threatening no person. He was only filming. That was enough for the Denver police to retaliate against him.

38.     On May 30, 2020, Alexis Mendez was attending the George Floyd protests in
downtown Denver. Mr. Mendez wanted to document the protests, so he filmed peaceful
protesters with his phone. While filming, a DPD officer shot Mr. Mendez in the chest
with a rubber bullet, causing bruising, which lasted several weeks.



39.     On May 30, 2020, Jeremy Jojola, an on-air correspondent for KUSA-TV/9News was
shot with a less-lethal projectile round while standing beside a professional cameraman
from that station. The round struck Mr. Jojola's backpack.

40.     On May 30, 2020, James Sweetman was recording DPD officers in riot gear firing tear
gas, pepper balls, and rubber bullets into a crowd of protesters. Soon, officers ran over

to Mr. Sweetman and fired pepper balls at him, striking him in the head and back. This was done in retaliation for his efforts to record their conduct.

41.    On May 30, 2020, Lindsay Fendt, a freelance reporter and photographer was standing in a group of press photographers when a law enforcement officer kicked a pepper gas canister directly into her face.



*Lindsay Fendt after having a tear gas canister kicked in her face*

42.     On May 31, 2020, Alex Burness of *The Denver Post*, was fired upon, without warning, by law enforcement and shot in the head and abdomen with rubber bullets. DPD officers fired at Mr. Burness just after he yelled out "PRESS." He sustained a contusion on his head and right abdomen.



*Alex Burness after being shot*

43.     On May 31, 2020, DPD officers shot at Trevor Hughes face with rubber bullets without warning. Mr. Hughes was photographing and recording the protests near Colfax and Emerson at approximately 8:30 p.m. While recording, with the camera near his face, DPD officers shot Mr. Hughes in the hand with a rubber bullet. The shot broke and

severed Mr. Hughes's right ring finger, leaving it dangling. Mr. Hughes immediately left the protest and went to urgent care. Mr. Hughes had to have his finger surgically repaired.

44.    On June 2, 2020, DPD officers shot Darrell Hampton in the face without warning. Mr. Hampton was peacefully protesting, and filming DPD officers, on the sidewalk near the Capitol in the afternoon. A number of DPD officers were standing on the back of a DPD pickup truck, carrying pepper ball guns. As the truck was driving away, one officer decided to randomly shoot Mr. Hampton in the face with a pepper ball for no apparent reason. There was no violence or property destruction happening; Mr. Hampton was simply standing on the sidewalk filming the protest and the officers.



**Denver Police Responded to Calls for an End to Police Brutality with Overwhelming Use of Force without Any Reasonable Basis**

45.    Over the course of the Denver George Floyd protests, the Denver police exhibited a callous disregard for the First Amendment rights and personal safety of thousands of peaceful protesters.

46.    Thousands of people were subjected to tear gas, pepper balls, pepper spray, and other chemical irritants which cause difficulty in breathing, skin irritation, and severe pain.

47.    Hundreds, if not thousands of protesters were also hit with kinetic impact projectiles.

48.    For the Denver police, calls for reform to policing and demands for accountability were to be met with force. The Denver police did not like the message that the protesters were expressing. It was that simple.

49.    Throughout these days of protests, Defendant Phelan, as Commander of the police response to the protests and Defendant Pazen, as chief of police, were made aware of the gratuitous use of force by their officers. Complaints were made by protesters along with calls from elected officials, imploring that the DPD and its officers stop using such brutality against those seeking change.

50.    DPD has body cameras and overhead videos, called HALO cameras, capturing much of the police violence. There were videos circulating online and being shown to Defendants Phelan and Pazen.

51.    Nonetheless, these Defendants took no action to rein in their officers. They knew of the brutality being inflicted and they ratified it each day with their indifference or support.

52.    After eight days of brutal violence inflicted on thousands of protesters and the infliction of fear in many more people who would attended the protests but for fear of

punishment, a District of Colorado Court issued a Temporary Restraining Order on the Denver police which called out their repeated and intentional violations of constitutional rights.

53.    This restraining order imposed common sense restrictions on police use of force – requirements such as a prohibition on aiming for heads and groins, requirements that police issues orders to disperse before using chemical irritants and that protesters be given adequate time to disperse, and that kinetic impact projectiles could not be shot indiscriminately into crowds.

54.    On May 28, 2020, Fernando Garcia attended the George Floyd protests in downtown Denver to express his beliefs on police brutality. During the course of that evening, Mr. Garcia was tear-gassed and shot in the back with rubber bullets and pepper spray. Mr. Garcia's roommate was also shot in the back by DPD officers with a rubber bullet.

55.    On May 28, 2020 Emily Heydt was protesting in Denver when a SWAT truck pulled up to a red light. Without provocation, several officers on the side of the vehicle shot her with pepper balls. When the light turned green, they drove away.

56.    On May 29, 2020 Ellektra Rowland was attending the George Floyd protests in downtown Denver. At about 9:30 p.m. Ms. Rowland was shot in the leg with a tear gas canister by DPD officers. This canister ripped open her jeans and cut her leg. Later that evening, DPD officers shot her in the head with pepper balls.

57.    On May 29, 2020, Christopher Holland was protesting in downtown Denver. He marched, holding a sign above his head. DPD officers then shot Mr. Holland in the wrist with a rubber bullet. Mr. Holland is lucky that it only hit his wrist as his hands

were above his head. It appeared to Mr. Holland that the officers had aimed for his

head.

58.    On Friday May 29, 2020, at around 3:45 p.m., Elizabeth Werren was marching in

Denver when DPD officers pepper sprayed her directly in the face.

59.    On May 30, 2020, Brianna Barber attended the George Floyd protests in downtown

Denver. While in Civic Center Park rendering aid to those who were injured, Ms.

Barber noticed a group of DPD officers storm the park, shooting rubber bullets, tear

gas canisters, and flash-bang grenades. Ms. Barber raised her hands in a "don't shoot"

gesture. DPD officers shot her with a rubber bullet. They also took her protest sign and

ripped it up.

60.    On May 30, 2020 Carter Nadolsky attended the George Floyd protest in downtown

Denver. Mr. Nadolsky had recently had surgery and was using crutches at the time.

While standing in the crowd, Mr. Nadolsky was targeted by a DPD officer and was

shot in the stomach with a rubber bullet. Mr. Nadolsky was knocked to the ground as a

result of the rubber bullet. While he was on the ground, DPD officers then shot Mr.

Nadolsky with pepper balls.

61.    On May 31, 2020 Alexandra Barbour was participating in a peaceful protest in

downtown Denver. During the course of the evening, DPD officers shot Ms. Barbour

in the right ankle with a rubber bullet. Ms. Barbour suffered serious injuries as a result

of this attack.

62.    On May 31, 2020, Jessica Beverage was attending the George Floyd protests in

downtown Denver when DPD officers, without provocation, began deploying tear gas

into a crowd of peaceful protesters. Ms. Beverage turned to escape the tear gas, but was instead shot in the back of the head with a tear gas canister.

63.    On May 31, 2020, DPD officers shot Darian Tindall in the chest with KIPs without warning. Ms. Tindall was hit in the chest with a pepper ball while marching on Colfax Avenue. Her hands were up above her head when she was shot, and she didn't see the projectile coming or anticipate the intense pain. She was given no warning by DPD.

64.    On June 1, 2020, David Chapman was standing alone on the sidewalk in front of his apartment speaking on the phone. A Denver SWAT vehicle with six officers hanging off the side drove by and as they passed him, one officer shot him in the kidney with a rubber bullet, causing significant pain and causing him to fall to the ground. As he got up, those officers fired a tear gas canister at this lone individual who had committed no crime and threatened no person. The DPD officers drove away.

**Denver Police Officers Repeatedly Intentionally Shot Protesters in the Head**

65.    The most concerning thing about the DPD response to the protests was their willingness to seek the infliction of maximum pain and potential death. Simply put, over and over again, Denver police officers aimed at and shot protesters in the head with rubber bullets.

66.    This is the use of deadly force.

67.    The manufacturers of rubber bullets say so.

68.    Academic and medical studies on the use of rubber bullets say so.

69.    And the Denver police operations manual says so.

70.    Nonetheless, night after night, Denver police took aim and struck protester after protester in the head. They took eyes and cracked skulls.

71.    Defendants Phelan and Pazen were made aware of the injuries to heads and eyes. They were told that protesters were being hit in the head and that people were exhibiting serious injuries at the hands of their subordinate police officers.

72.    They took no action.

73.    On May 28, 2020 Michael Acker was attending the George Floyd protests in Denver was he was struck in the face with a rubber bullet. He had worn a gasmask to protect against the indiscriminate use of tear gas and pepper bullets which DPD had utilized over the week to send the message that protesting police violence was not permitted in Denver. He immediately lost vision in his right eye and when he pulled this gasmask off, blood poured all over his hands, face, and the concrete below him. Had he not been wearing a mask, he likely would have lost his eye.



74.    On May 29, 2020, Gregory Trickel was attending the George Floyd protests in downtown Denver when he was ordered to disperse by Denver Police officers. Mr. Trickel then put his hands in the air to show that he was going to comply with the DPD officers' demands. At this point, DPD officers pointed their rubber bullet launchers at his face and genitals. Mr. Trickel knew that they were aiming for him because he could see the laser guides. One DPD officer then intentionally fired a rubber bullet directly at Mr. Trickel's head from 15 feet, but fortunately this officer had poor aim and missed.

75.    On May 29, 2020, DPD officers shot Gabriel Thorn in the head with a KIP. While at the protest, Mr. Thorn served at times as a medic. Mr. Thorn is a veteran who served in the Armed Forces. Mr. Thorn also wore a red cross on his helmet and backpack to indicate that he was a medic there to treat those injured. Several times while treating injured people, DPD officers targeted him and shot pepper balls. He observed a largely peaceful protest. He witnessed DPD officers utilize rubber bullets, tear gas, flash bang grenades, and pepper balls. The protesters were attacked indiscriminately with these ordinances and without regard for safety. Mr. Thorn also observed DPD officers aiming at bodies and heads when firing rubber bullets. Having served in the military and been trained to use rubber bullets, Mr. Thorn was shocked that these officers had not been trained to use them correctly. His training in the military made clear that these bullets were to be aimed at the ground and never directly at people, even in war zones. During the protest, Mr. Thorn was struck with pepper balls and rubber bullets, and he was tear gassed multiple times. When DPD officers fired rubber bullets at Mr. Thorn, they struck him the head, just as they did countless others during the peaceful protests. Fortunately, Mr. Thorn was wearing a helmet. Mr. Thorn was one of the four Plaintiffs

who sued the City of Denver and obtained a Temporary Restraining Order against the excessive use of force by DPD. Unfortunately for at least a dozen people, the TRO was not entered until Friday, June 5, 2020.

76. On May 29, 2020, in the afternoon, DPD officers shot Megan Matthews in the head with a kinetic impact projectile (KIP) while she was participating in a peaceful protest near the Capitol. When she was shot in the head, Ms. Matthews was standing alone and not engaged in any violence or property destruction. When hit with the KIP, she immediately blacked out. When she woke up, her face was covered in blood. A friend then carried Ms. Matthews to a grassy area near the State Capitol, where she was bandaged by a doctor and later loaded into an ambulance.



77.    On May 30, 2020, DPD officers shot Jax Feldmann in the eye with a KIP without

warning. Mr. Feldmann wasn't protesting when a law enforcement officer riding on the

back of a DPD truck fired a projectile at his face without warning and blinded him in

one eye. Mr. Feldmann was walking from his friend's apartment to his car. There were

no large groups of protesters nearby when Mr. Feldmann was shot and no one near him

yelled at or threw anything at the DPD officers on the truck, which was marked with

the DPD logo. Mr. Feldmann didn't see what hit him, but that reached his hand up to

his face and felt blood. Jax was shot in the eye by a police officer riding on a police

truck. His friend called 911 and Mr. Feldmann was transported to Denver Health via

ambulance. Alone in the hospital, Mr. Feldman was told by doctors that they would

have to perform emergency surgery to save his eye and doctors performed that surgery.

However, Mr. Feldmann will never regain his full vision. The surgeon who operated

on Feldmann's eye told Mr. Feldmann's mother that the damage was consistent with a

rubber bullet.



*Mr. Feldman after being shot*

20

78.     On May 30, 2020, DPD officers without warning shot Russell Strong in the head with

a KIP. Mr. Strong was protesting near Civic Center Park and carrying a sign that read

"No justice, No peace." Shortly after 6 p.m., Mr. Strong was hit in the face with a KIP.

The force of the KIP knocked him out. As a result of this use of force, Mr. Strong

required several facial reconstructive surgeries to repair broken bones around his eye

and to realign the right side of his jaw. Mr. Strong lost his right eye because of the use

of force by DPD officers. When he was shot, Mr. Strong was simply peacefully

protesting and was not engaging in any violence or property destruction.

 

*Mr. Strong after being shot*

79.     On May 30, 2020, Dan Delany was peacefully protesting in Downtown Denver. Mr.

Delany engaged in chants of "no justice, no peace." He also joined with others in asking

the DPD officers to march with them. Instead, the officers began indiscriminately

shooting rubber bullets, tear gas, and pepper balls into the crowd. He turned and ran,

but one officer shot him with a rubber bullet in the back of the head. He was rendered

unconscious and left bleeding from the head.

80.    On May 30, 2020, DPD officers shot Elizabeth Epps in the face with a KIP without warning. Prior to the curfew, DPD officers shot Ms. Epps with rubber bullets during a warning. A rubber bullet hit her face, breaking the plastic medical-grade respirator mask she was wearing and wounding her face.



*Ms. Epps after being shot*

81.    On May 30, 2020, DPD officers shot Michael McDaniel in the head with KIPs without warning. Mr. McDaniel attended the protest rally on Saturday afternoon to serve as a medic to attend to those injured by the police. At one point, the Police unnecessarily and overwhelmingly tear-gassed a parking lot on the corner of Colfax and Lincoln. The tear gas was so thick, that it form an opaque cloud. Mr. McDaniel saw a protester crawling out of the cloud on his hands and knees. The protester was choking and could

not breathe. Mr. McDaniel, with his back to the police, kneeled down to treat the protester, who was still on all fours. The police then proceeded to target and shoot Mr. McDaniel and the protester with pepper bullets. They shot Mr. McDaniel in the head with KIPs. Thankfully, Mr. McDaniel was wearing a helmet, so when the police aimed at his head, they did not cause any injury, other than the intense burning pain that Mr. McDaniel experienced as a result of the pepper balls.

82.     On May 31, 2020, DPD officers shot Youssef Amghar in the head and chest with KIPs without warning. Well before curfew, Mx. Amghar was with other peaceful protesters on the corner of Colfax and Lincoln. Protesters were chanting, "Hands up, don't shoot," and holding signs. Mx. Amghar was standing on the sidewalk. There was a line of DPD officers on Colfax. Mx. Amghar stood there with their hands up. Someone else not near them in the crowd threw a water bottle at the officers. The DPD officers immediately began shooting into the crowd with pepper balls. They did this without warning or giving any orders. At first, the DPD officers shot indiscriminately into the crowd, but after the crowd moved back, they began shooting directly at Mx. Amghar, even though they were standing still with their hands up. The DPD officers first shot them in the arms and legs, then in the chest, and then directly in the face, even though they continued standing still with their hands up. The DPD officers shot them approximately 14 times. The DPD officers did not give any orders before, during, or after this incident. No one told Mr. Amghar to move back or gave them any other orders. Mx. Amghar was so upset at the DPD officers' use of force on them that they began yelling words to the effect of, "I'm a goddamn U.S. Marine, what are you doing?" Then DPD officers

began throwing tear gas canisters at their feet. After a couple minutes, Mx. Amghar

walked away and took cover behind a tree.

83.    On May 31, 2020, Gabe Schlough was shot in the face with a KIP by DPD officers

without warning. Mr. Slough, an individual with a degree in public health anthropology

who also has some medical training and had participated in protests before, attended

the protests near the state Capitol with the intention of being there help anyone who

was injured by the DPD officers. When Mr. Slough arrived, he saw a crowd of two or

three hundred people facing down a line of police. The officers were standing just a

little bit more than shoulder to shoulder apart with full riot gear, with their face shields

and full protective armor on. Mr. Slough, sensing a conflict, moved up toward the front

of the crowd and began to tell people who didn't have eye coverings to watch their eyes

and protect their face. DPD officers then shot a woman in the chest with a tear gas

canister right next to Mr. Slough. Mr. Slough bent down to help the woman and, while

doing so, covered the tear gas canister with a cone. As soon as he did this, officers shot

Mr. Slough in the face and chest with KIPs. Mr. Slough described the sensation as

getting his with a baseball bat. He helped the woman back away from the line of DPD

officers and, as he did so, the other individuals he had attended the protest with told

him that his chin was falling off. The KIP had left a gaping wound on his chin, and

blood was pouring down onto the front of his shirt. Mr. Slough went to the hospital

where he required 22 stitches to close the wound on his chin. He still experiences pain

from this wound and will likely require plastic surgery for it to heal properly.



*Mr. Schlough's chin after being shot*

84.    On May 31, 2020, Zachary Packard was shot in the head with a KIP by DPD officers without warning. Mr. Packard arrived at the protests on streets surrounding the Capitol at about 8 p.m. DPD officers formed lines on two perpendicular streets and began closing in on the groups of protesters. Mr. Packard heard a message from a SWAT vehicle that "curfew was in effect." DPD officers then started firing tear gas. Mr. Packard attempted to kick one tear gas canister away from the group of protesters near him. As he stepped off the sidewalk, Mr. Packard was hit in the head with a projectile. He was immediately knocked unconscious. DPD officers did not issue a warning before shooting Mr. Packard in the ear. Bystanders carried Mr. Packard from the sidewalk over into a patch of grass. When he returned to consciousness, a friend took him to the hospital. A CAT scan later revealed that Mr. Packard suffered a fractured skull and

jaw, two fractured discs, and bleeding in his brain. Mr. Packard remained at the hospital

for about one week.



*Mr. Packard after being shot in the head*

85.     On May 31, Alex Wolfson was on his skateboard, observing the protests downtown

when he was shot in the eye with a projectile by DPD officers. At the time he was

struck, he was committing no crime, violating no law, and threatening officer or other

individual. He was simply watching the protest. Nonetheless, DPD officers shot him in

the eye. He immediately lost sight in his left eye and was bleeding. He was so distraught

that he went over to a DPD officer to ask if he still had his left eye. Wolfson was

fortunate that he didn't lose his eye or his eyesight, but he did require laser surgery

from an emergency retina specialist to address eyesight problems he sustained as a

result of this attack.



*Mr. Wolfson after being shot in the eye*

86.    On June 1, 2020, DPD officers shot Ambrose Cruz in the head and chest with KIPs

without warning. As a photographer and freelance journalist, Mr. Cruz wanted to

document the protests as well as the police response. Throughout the evening, he

documented the protests and police action as a photojournalist. At about 8:00 p.m., he

was with protesters in front of the Capitol. The protesters were chanting and peaceful.

There were over 100 people present. There was a line of DPD officers present on all

sides of the protesters, surrounding them. Sometime after 9:00 p.m., DPD officers

moved in and began rapidly shooting tear gas and rubber bullets at the protesters. They

did not give any warning or orders. Because the police had surrounded the protesters

on all sides, it was difficult for protesters to escape. Mr. Cruz ran away from the gas.
Mr. Cruz encountered a group of 35 protesters at a corner, and they were all younger
protesters, including teenagers. Almost all of them were Black. One protestor was
having a seizure. Mr. Cruz and others tried to help him. Some people tried to leave, but
DPD officers cornered them and shot pepper balls at them. A white person went up to
the DPD officers to ask if they could leave because people wanted to go home. The
DPD officer said that they could go home, and so people started walking towards where
the officer told them to go. That officer started firing on people and everyone started
running. Mr. Cruz ran with other protesters to a building and garage at 13th Avenue
and Lincoln. The DPD officers ran after them. The DPD officers were shooting them
with pepper balls. They did not give any orders or warnings. Mr. Cruz and others ran
down to the garage but discovered that armored vehicles blocked off both ends of the
block and there was no exit. Cruz ran up the stairs, and as he looked up, a Defendant
DPD Officer shot him in the face with pepper balls. The DPD officer hit him three
times in the eye area and knocked his glasses off. A female DPD officer told him, "If
you don't fucking get on the ground, I'm going to fucking kill you," or words to that
effect. Even though Cruz stopped and was on the ground, the other DPD officer
continued firing pepper balls at him, including at the back of his head. The DPD officer
who had been repeatedly firing pepper balls at Cruz at close range taunted him, saying
things like, "What happened to you? It looks like your wife beat you. Mr. Cruz's eye
was bleeding, swollen shut, and bruised. He could not open his eye.

87.     In the first days of the protests, Nicholas Orlin came downtown to march, chant, and
        sing in support of the Black Lives Matter movement. On one of those first days of the

protests, Nicholas was shot with a rubber bullet in the eye. He was knocked unconscious and awoke in the hospital. Nicholas sustained several fractures along the base of his eye and suffered significant swelling. He has been told by his doctors that he now has an increased likelihood of developing glaucoma. He also suffers from post-traumatic stress disorder as a result of his attack. "It gives me anxiety when I think about joining protests" he told a Fox31 reporter last year.



*Mr. Orlin after being shot*

88.    On the weekend of May 30-31, Shawn Murphy attended the George Floyd protests. Early in the evening before the beginning of curfew, he found himself caught up in a cloud of tear gas. As he would recount, no one was breaking any laws and many were

attempting to disperse but were caught in clouds of tear gas. At one point, while he was trying to disperse, Murphy was struck in the eye with a rubber bullet. Murphy was wearing swim goggles – something that likely saved his left eye. "The goggles shattered, exploded, but I really think it saved by eye." Murphy required emergency surgery that evening to save his retina. His vision has remained blurry.



*Mr. Murphy after being shot in the eye*

**89.**    On May 31, 2020, Michael Driscoll attended the George Floyd protests in Downtown Denver. While holding a sign with a protest message spray painted on it, Mr. Driscoll was struck by a rubber bullet between the eyes. This shot was intentional. This resulted in a serious injury, required facial reconstruction surgery.

## <u>THIRTEEN PLAINTIFFS ARE BRUTALIZED FOR THEIR POLITICAL EXPRESSION</u>



A protester stands in a cloud of tear gas from police during a May 30 protest after the killing of George Floyd. Thousands gathered to protest as police enforced a citywide curfew. *AAron Ontiveroz, The Denver Post*

### <u>Marquis Dominick</u>

90.   On May 30, 2020, Marquis Dominick decided to attend the George Floyd protests in downtown Denver.

91.   Mr. Dominick created a t-shirt that listed the names of Black people killed by police in America on the back and had a target and the words, Black Target on the front.

92.   Mr. Dominick is a Black man.

93.   Intending to tend to those injured during the protests, Mr. Dominick also brought medical supplies and a jug of milk to apply to chemical burns.

94.   As soon as he arrived with his friends, he noticed the contrast between peaceful protesters and militarized police, some of whom stood on the roofs of buildings, holding guns.

95.     Almost immediately, he saw the Denver police shooting at medics as they attempted to
care for injured individuals, the police would target them by firing tear gas and flash
bang grenades at them.

96.     Seeking to distract the Denver police from their efforts to punish the medics, Mr.
Dominick then went to the front of the police line to both express his opinion and seek
to protect the medics from assault.

97.     He asked the police to stop shooting at injured protesters and the medics who were
trying to treat them.

98.     The police obliged and turned their focus on Mr. Dominick.

99.     Over the next several hours, Denver police officers threw tear gas canisters and flash
bang grenades at Mr. Dominick.

100.    Officers pepper sprayed Mr. Dominick.

101.    Officers tried to shoot Mr. Dominick with rubber bullets, but missed.

102.    They shot pepper balls at him, repeatedly aiming for the target on his shirt and the milk
jug in his hand.



103.    The police saw a Black man wearing a target on his chest and they shot at him. Repeatedly.

104.    This egregious conduct was caught on camera, including the body cameras of several officers.

105.    None have been punished for their misconduct.

106.    The police retaliated against Mr. Dominick in part because they saw the milk jug as contrary to their goals of inflicting as much pain as possible and exacting a price for protesting.

107.    The pierced the milk jug with one of their rounds of ammunition. They did not want protesters to have access to milk to relieve the pain the police were imparting.

108.    At no time did Mr. Dominick commit any crime – not even the curfew as this was during the afternoon hours.

109.    At no time did Mr. Dominick threaten any person, including a police officer, with violence.

110.    At no time did Mr. Dominick destroy any property.

111.    He simply stood there, with his hands up, calling out police brutality and the killings of far too many Black men in American by the police.

112.    To this day, that shirt is stained by and reeks of those chemical irritants.

113.    As a result of these assaults and violations of Mr. Dominick's free speech, Mr. Dominick suffered ongoing pain and trauma for nearly a year.

**Brett Rios**

114.    On the Evening of June 1, 2020, Brett Rios decided to drive from Estes Park to document and participate in the George Floyd protests in downtown Denver.

115.  Mr. Rios encountered peaceful protesters and police officers in riot gear.

116.  At one point, while taking photographs to document this scene, Mr. Rios decided to
      kneel in the streets with his fellow protesters, arms raised, chanting "hands up, don't
      shoot."

117.  The police lined up to confront this peaceful crowd.

118.  Without warning, the Denver police began to launch a barrage of tear gas canisters and
      flash bang grenades into this kneeling crowd.

119.  The air was filled with smoke and chemicals, making it impossible to breathe.

120.  While still kneeling, a flash bang or concussion grenade exploded in Mr. Rios' lap.

121.  Fearing for his life, he stood to run and as he attempted to flee, was struck with pepper
      balls and rubber bullets.

122.  Then, Mr. Rios' leg was shot out from under him, causing him to fall.

123.  As he fell, he saw the 40mm rubber bullet that had struck him in the leg roll by.

124.  He continued to be inundated with tear gas, pepper balls, and flash bang grenades.

125.  When he finally found his way out of the cloud of tear gas and other chemical irritants,
      Mr. Rios was promptly shot with a dozen pepper balls by another police officer who
      stood only six feet away.

126.  He then say police officers shooting pepper balls at medics who were attempting to
      treat an injured protesters.

127.  Mr. Rios started to limp away to try to leave the protests as the police had made it too
      difficult to continue expressing their views when he noticed the police striking another
      protester.

128.  Mr. Rios pulled out his phone and began to record this police brutality.

129.  Seeing Mr. Rios documenting this brutality, a different officer yells at him to leave and within seconds, tackles Mr. Rios to the ground as part of an arrest.

130.  This is all on film.

131.  Prior to and during his arrest, Mr. Rios committed no crime, was a danger to no person, never resisted arrest, and never destroyed any property.

132.  In tackling Mr. Rios, this police officer destroyed his camera equipment.

133.  Mr. Rios is a professional photographer and his equipment was expensive.

134.  During his arrest, the police then threw him in the back of a police car with the windows rolled up for approximately 30 minutes. Mr. Rios struggled to breathe because of the chemical irritants which had soaked his clothes.

135.  The police officers were indifferent to this.

136.  When he arrived at the jail, one officer told him to spread his legs.

137.  Mr. Rios could not do so because of the pain in his leg from being shot by a rubber bullet.

138.  Mr. Rios told the officer or deputy this, but he didn't care and instead kicked Mr. Rios' leg out, causing Mr. Rios to fall to the ground.

139.  The officer then said that Mr. Rios was being combative and placed him in solitary confinement, denying Mr. Rios the opportunity to place a phone call or see a judge for several days.

140.  He was held for three days, denying him the opportunity to protest further.

141.  Mr. Rios was ultimately charged with a protest curfew violation, which was later dropped.

**Alex Hickman**

142.    Alex Hickman is a Black man who was shot by Denver police with a rubber bullet for being Black.

143.    Throughout the George Floyd protests, Mr. Hickman had stayed away and instead would clean up the street and alleyway around his apartment building.

144.    However, on the evening of May 31, 2020, Alex Hickman was subjected to excessive force on the basis that Denver Police perceived him to be a rioter based on his race.

145.    That evening, Mr. Hickman was smoking a cigarette in the alleyway behind his house after work at a restaurant.

146.    Mr. Hickman then noticed that some protesters had set a dumpster on fire.

147.    As he approached the dumpster to attempt to put out the fire, a police cruiser drove by, shooting a rubber bullet at Mr. Hickman.




148.   No officer said a word to Mr. Hickman, either a word of warning nor after they shot him.

149.   In fact, the vehicle never even stopped.

150.   John Doe police officer simply shot Mr. Hickman from the window of his vehicle and kept driving.

151.   John Doe officers never arrested anyone, nor attempted to arrest anyone.

152.   John Doe officers had no basis for believing that Mr. Hickman was committing or about to commit any crime.

153.   John Doe officers made no effort to speak with Mr. Hickman prior to using force.

154.   They simply sought to punish Mr. Hickman for their perception of him based on his race.

155.   As a result of this officer's racially-motivated excessive force, Mr. Hickman suffered serious injuries which affected his health, his ability to work, and otherwise has left him more afraid that police will use force on him simply because of his race.

**Tashari Sellers**

156.   On May 29, 2020, Tashari Sellers attended the George Floyd protests in downtown Denver.

157.   Mr. Sellers, a Black man, is also a reservist in the military.

158.   Mr. Sellers was present at the Friday night protest for approximately thirty minutes.

159.   As a Black man, he didn't want to risk harm, so he found a spot in civic center park alone where he could take a knee and raise his first.

160.   Within minutes, Mr. Sellers and Ms. Klotzer, who had joined him, were encircled by twenty police officers.

161.  Before the police approached, they gave no warning, gave no orders, and otherwise did not communicate with Mr. Sellers.

162.  The officers ran at these two silent protesters, guns raised yelling at them to get on the ground.

163.  Mr. Sellers did not move, fearing that he would be shot with live ammunition.

164.  The officers grabbed his hands, handcuffed him.

165.  When protesters tried to take pictures of the police arresting Mr. Sellers, the officers pointed their weapons and threatened these individuals.

166.  Mr. Sellers was then taken to the downtown detention center.

167.  When they arrived, the police officers told the Sheriff's deputies that he was a "violent protester."

168.  Mr. Sellers was then held for three days without seeing a judge. During his time, he was held in 23 hour lockdown.

169.  He was charged with a park curfew violation.

170.  This charge was later dropped.

171.  The Denver police have never arrested someone for violating the park curfew. They ask people to leave and if necessary, they write a ticket.

172.  That night, the Denver police used the park curfew to punish Mr. Sellers for protesting and to deny him the right to protest during the following nights by imprisoning him.

173.  The Sheriff's deputies, in fraternity with the Denver police, abused their discretion and punished Mr. Sellers, a pretrial detainee, but placing him in solitary confinement and lockdown and denying him the opportunity to see a judge for several days.

**Raymond Schwab**

174.    On May 30, 2020, Raymond Schwab and his stepson attended the George Floyd protest
in downtown Denver.

175.    Mr. Schwab and his stepson walked through the crowd, noting that it was a peaceful
group and also that police officers in riot gear had lined up across from one group of
protesters.

176.    Without warning or provocation, the police officers began shooting tear gas and pepper
bullets into the crowd.

177.    This use of force was entirely indiscriminate.

178.    Instead of responding, the crowd of protestors took their protest to the 16th street mall.

179.    Mr. Schwab followed this protest, but soon word spread that the Denver police were
attacking a different group of protesters, so Mr. Schwab decided to return to Civic
Center Park to attempt to record the use of force on protesters with his phone.

180.    Mr. Schwab began livestreaming and as he neared Civic Center Park, he began to hear
screams of fear from protesters and the percussive sounds of flashbang grenades.

181.    Although he had seen no property destruction or violence, he witnessed continual use
of force on peaceful protesters.

182.    While standing and filming, the police shot a man standing next to Mr. Schwab in the
face.

183.    This protestor was knocked unconscious and Mr. Schwab and other protestors
attempted to provide first aid to him along.

184.    While they tried to render aid to this seriously injured man, Denver police targeted
them with pepper balls and other munitions.

185.   Mr. Schwab then approached the front line of the protest and resumed filming.

186.   Moments later, it became clear to him that the Denver police were targeting him for his filming of their abuses.

187.   Mr. Schwab then turned and ran, trying to avoid these officers' retaliation.

188.   He could hear and feel pepper balls exploding around him and a flashbang grenade exploded next to him as he ran.

189.   He then felt a surge of pain as he was struck in the back with a rubber bullet.

190.   The force of this attack caused Mr. Schwab to drop his phone and fall to the ground.

191.   He later developed a large bruise consistent with an injury resulting from a rubber bullet.

192.   Mr. Schwab continued to film, seeing horrors all around and the aggressive targeting of protesters and journalists by the Denver police.

193.   Fearing for his and his stepson's safety, Mr. Schwab left shortly after being struck.

194.   However, Mr. Schwab developed PTSD as a result of the police response to the protests.

195.   As a veteran, the scene was all too reminiscent of an actual war zone.

196.   As a result, Mr. Schwab and his stepson left the protest in fear for their safety and did not return to protest out of fear of the Denver police officers' response.

**Jesse Friedman**

197.   Over the course of the first four nights of the George Floyd protests in downtown Denver, Mr. Friedman was subjected to excessive force on account of his protected expressive activity.

198.   On the afternoon of Thursday, May 28, 2020, Mr. Friedman was in a crowd outside of one of the Denver police stations, chanting "Hands up, don't shoot" at police officers.

199.   At some point, the police decided to shoot pepper balls at individuals, shooting protesters, including Mr. Friedman, while their hands were up in the air.

200.   Soon, Mr. Friedman along with the other protesters, began hiding behind parked cars for protection.

201.   Whenever a protester would look over the car, police officers began shooting at them, often aiming for their heads.

202.   Mr. Friedman was shot multiple times in the early hours of the first day of protest, causing him to cough and experience serious breathing issues and pain.

203.   Mr. Friedman committed no crime, never resisted arrest, was a danger to no person, and was destroying no property.

204.   The police were simply trying to silence a protest against police brutality.

205.   Throughout this first day of protest, Mr. Friedman kept his distance from police, but recorded these early instances of police brutality on his phone.

206.   At some point before sunset, the police decided that they would not permit people to protest across the street from the police station and began to shoot hundreds and hundreds pepper balls in a barrage at the protesters.

207.   Again, Mr. Friedman was struck.

208.   Even after he decided to turn and run for safety, the police officers shot him in the back with pepper balls.

209.   Later, Mr. Friedman was struck with a rubber bullet.

210.   Again, Mr. Friedman had committed no crime, never resisted arrest, was a danger to no person, and was destroying no property. He was simply protesting.

211.   A few minutes later, the police began to fill the streets with tear gas.

212.   The police used this force simply because they wanted to end the protest and punish the protesters for their beliefs and expressive conduct.

213.   Mr. Friedman experienced difficulty breathing and pain as a result of this unwarranted used of chemical munitions.

214.   Later that evening, the protest moved down to the state capitol building. The protest largely consisted of protesters, including Mr. Friedman, chanting "hands up don't shoot" with their hands raised.

215.   The police again responded with tear gas, causing protesters, including Mr. Friedman to run.

216.   While running away, Mr. Friedman was again shot in the back, this time with a rubber bullet.

217.   Later that same evening, a police officer fired a tear gas canisters at Mr. Friedman, narrowly missing him, but engulfing him in tear gas.

218.   Over the course of the evening, Mr. Friedman was subjected to tear gas, pepper balls, and rubber bullets no fewer than ten times.

219.   Nonetheless, Mr. Friedman came out again on May 29, 2020 to ensure that his voice was heard and these incidents were recorded.

220.   Throughout his time protesting on May 29, 2020, Mr. Friedman was again subjected to tear gas, pepper balls, and flashbang grenades.

221. At one point, Mr. Friedman was blinded for 10-15 minutes after a flash bang grenade exploded near his head. Mr. Friedman had not seen the flash bang coming because moments earlier, the Denver police had tear gassed the streets, leaving a cloud of chemical irritants.

222. Mr. Friedman again attended the downtown Denver protests on Saturday, May 30, 2020 to express his opinions and document police aggression.

223. He arrived at approximately 4:45 pm.

224. For the next 3 hours, the Denver police engaged in a campaign to silence the protesters, using tear gas, pepper balls, pepper mace, and rubber bullets with impunity.

225. Mr. Friedman was subjected to tear gas at least 10 times that day.

226. On Sunday, May 31, 2020, Mr. Friedman again came to downtown Denver to express his opinions and document the protests.

227. However, the fear and trauma from the preceding three days caused Mr. Friedman to stay towards the edges of the protests to attempt to avoid being tear gassed once again.

228. Mr. Friedman successfully avoided most of the tear gas, but at the expense of his ability to fully express his voice.

229. At no time was Mr. Friedman committing a crime, resisting arrest, threatening any person, or destroying any property.

230. For months after, Mr. Friedman, a former naval officer, experienced difficulty sleeping and other trauma as a result of the way that the police had created a warzone atmosphere at the Denver protests.

**Susan McKillips**

231.    On May 30, 2020, Susan McKillips, a 69 year old woman, came to Denver to participate in the George Floyd protests.

232.    While protesting on May 30th, Ms. McKillips was holding a sign saying "Justice for George Floyd."

233.    While holding her sign, a Denver police officer sprayed her with pepper spray, directly in the face.

234.    Ms. McKillips again attended the George Floyd protests on June 1, 2020. While protesting, Ms. McKillips was holding a sign which read, "I can't breathe."

235.    Ms. McKillips was standing alone on Lincoln when she looked up at the state capitol balcony.

236.    Standing on the balcony was a Denver police officer.

237.    The officer looked at Ms. McKillips, making eye contact and then fired a tear gas canister at her.

238.    The canister came within inches of hitting Ms. McKillips in the head.

239.    As the tear gas canister flew by her head, it exploded, subjecting Ms. McKillips to a significant amount of tear gas.

240.    Ms. McKillips struggled to breathe and ran.

241.    Other protesters had to help Ms. McKillips flush her eyes sue to the chemical irritation.

242.    When this John Doe officer shot the tear gas canister at Ms. McKillips, she was committing no crime, a danger to no person, not resisting arrest, and was not destroying property.

243. She was simply holding a sign with a message to which this John Doe officer took offense.

244. Ms. McKillips is fearful to this day of participating in protests for fear of retaliation by the police and her vision has worsened as a result of the chemical irritants used on her.

**Ryan Kehoe**

245. Mr. Kehoe attended the George Floyd protests in downtown Denver on May 28, 2020.

246. While engaged in protest activity, Mr. Kehoe was subjected to tear gas chemicals.

247. The launching of these canisters was done without warning or orders to disperse.

248. While walking home from the protest in fear for his safety, Mr. Kehoe struggled to breathe.

249. Mr. Kehoe again attended the George Floyd protests on May 30, 2020.

250. While in the protest crowd, Denver police officers fired tear gas, pepper balls, and flash bang grenades at him and other protesters.

251. As a result of these uses of force, Mr. Kehoe struggled to breathe and have irritated eyes and skin.

252. Mr. Kehoe then turned to run and was shot in the back several times with pepper balls.

253. He then attempted to use his skateboard for protection, but was struck in the chest with a kinetic impact projectile which has abrasions across his chest and rib cage.

254. Disoriented, Mr. Kehoe attempted to flee, but a flash bang grenade then exploded only two feet from him, causing further pain, fear, and disorientation.

255. At no time did Mr. Kehoe commit any crime, resist arrest, threaten any person, or damage any property.

**Adam Bentch and Patricia Koo**

256.    On May 30, 2020, Adam Bentch and Patricia Koo attended the George Floyd protests in downtown Denver to participate and document this important social movement.

257.    When Mr. Bentch and Ms. Koo arrived at the state capitol in the afternoon, it was exceedingly peaceful.

258.    They observed protesters standing around, some eating snacks, others providing water to those who were thirsty, and some holding handmade signs with expressions opposing police brutality and misconduct.

259.    At some point later, Mr. Bentch and Ms. Koo noticed that the atmosphere changed as a result of police actions.

260.    The police, seeking to confront the peaceful protesters, began driving through the streets, officers in full military garb, hanging off of vehicles.

261.    The officers then formed a line on one street and started to push protesters.

262.    The police officers pointed their weapons at protesters who had committed no crimes and threatened them for their speech.

263.    The protesters responded with chants – "why are you in riot gear – we don't see no riot here."

264.    The protesters then kneeled with their hands in the air to continue their peaceful protest.

265.    The police officers then approached the protesters, giving no commands or warnings.

266.    Then suddenly, the police fired tear gas canisters and pepper balls into the crowd.

267.    Quickly, the protesters ran, suffocating on chemical agents.

268.    Mr. Bentch attempted to continue taking photographs, but was quickly overwhelmed by the tear gas.

269.   Mr. Bentch the stumbled toward civic center park, collapsing several times in a
coughing fit.

270.   Mr. Bentch was ultimately helped by medics, but the effects of tear gas on his eyes and
lungs was severe.

271.   Ms. Koo, a professional photographer, was standing off to the side, documenting this
moment.

272.   She attempted to remain, even as the tear gas enveloped her.

273.   Then, a Denver police officer noticed her and immediately raised his gun and pointed
it at her.

274.   Ms. Koo turned and began to run, fearing for her safety.

275.   The officer then shot several rounds, hitting Ms. Koo on the thighs and genital area.

276.   Ms. Koo's pain was intense and she immediately feared that she had been shot with a
real bullet. She checked where she had been shot, expecting to see blood.

277.   Disoriented and in pain, Ms. Koo looked for a place to rest. She feared for her life in
that moment.

278.   Ms. Koo found a place to sit and attempted to collect her thoughts.

279.   Soon, Mr. Bentch found Ms. Koo and they tried to leave, scared and in pain.

280.   As they walked, Mr. Bentch collapsed several more times and Ms. Koo struggled to
walk with the pain in her leg.

281.   On the way to their car, they found a medic tent and sought treatment.

282.   For the next several hours, Ms. Koo suffered intense pain as a result of this unprovoked
attack.

283. When Mr. Bentch and Ms. Koo attempted to attend a protest the following day in Omaha, they were too fearful of the police to participate.

### Isis Usborne

284. On the evening of May 28, 2020, Ms. Usborne attended the George Floyd Protests in downtown Denver.

285. Along with several friends, Ms. Usborne joined thousands of demonstrators to express her views about police violence and brutality.

286. She held a sign and chanted, at times directing her speech to police officers in riot gear.

287. The police officers soon yelled at the protesters to stop protesting and leave.

288. The police then formed a line and began pushing the protesters, including Ms. Usborne with batons and mace.

289. The police shot tear gas canisters and flash bang grenades into the crowd.

290. No one had committed any crime, was committing a crime, or destroying property.

291. In fact, this was the first day of protests and those protesting were surprised that the Denver police were responding to their protests with force.

292. At one point, a police officer shoved Ms. Usborne's friend Mysha, a Black woman, several times.

293. Ms. Usborne told the officers not to touch Mysha and in response, the officer sprayed Ms. Usborne with bear mace directly in her eyes.



294. Ms. Usborne immediately fell to the ground in pain.

295. Screaming, crying, and groaning in pain, Ms. Usborne struggled to find a convenience store to buy milk to deal with this unjust attack.

296. For the next eight hours, Mr. Usborne experienced severe pain as a result of this officer's wanton use of chemical agents.

297. When Ms. Usborne was attacked by the police officer, she was committing no crime, was no threat to any person or officer, and was committing no property destruction.

298. She was simply expressing her political beliefs on police brutality.

299. This use of force intimidated Ms. Usborne and stopped her protest, both the evening of May 28, 2020 and during future protests.

**Kristen Klotzer**

300. On May 28, 2020, Kristen Klotzer attended the first night of the George Floyd protests in downtown Denver.

301. Ms. Klotzer attended to express her political opinions on police brutality, abuse misconduct, and police killings in America.

302. Over the course of that evening, Ms. Klotzer never broke any law, never engaged in any property destruction, and was a danger to no person. She was simply there to chant, march, and peacefully express her beliefs.

303. Over the course of the evening, Ms. Klotzer was shot with pepper balls at least six times, was completely covered in mace by one officer, subjected multiple times to tear gas, and was threatened by other officers throughout the evening.

304. Nonetheless, Ms. Klotzer returned again on Friday, May 29, 2020 to continue to support this protest movement.

305. As with the night before, Ms. Klotzer witnessed and was subjected to use of force by the Denver police over the course of the evening, including the use of tear gas, flash bangs, and pepper balls.

306. At around 11 pm, she noticed a Black man kneeling alone with his hand in the air.

307. She decided to join him.

308. As Ms. Klotzer and Mr. Sellers kneeled there, approximately twenty police officers swarmed at them while aiming their guns at Ms. Klotzer and Mr. Sellers.

309. Without warning, the Denver police officers arrested Ms. Klotzer and Mr. Sellers for breaking the park curfew, but in reality, they were arresting these two individuals for protesting police brutality.

310. Denver does not arrest people for violating park curfews. They are given tickets.

311. Ms. Klotzer's arrest was an instance of selective enforcement of the Denver park curfew to punish her for her speech.

312. The Denver police succeeded.

313. Ms. Klotzer was held in solitary confinement for several days and was unable to continue participating in the protests during the remainder of the weekend.

314. Fearing for her safety and her liberty, Ms. Klotzer was afraid to again engage in protest activity.

315. When Ms. Klotzer was placed under arrest, she was placed in extremely tight plastic hand ties.

316. She complained to the officers, but they were unwilling to adjust her restraints.

317. As a result, she lost feeling in her left hand, taking nearly two weeks to regain proper usage of that hand and with continued pain in that hand.

318. When they arrived, the police officers told the Sheriff's deputies that he was a "violent protester."

319. While in jail, the Denver Sheriff's deputies continued the Denver police effort to punish Ms. Klotzer for her speech.

320. She informed the guards immediately that she was a Buddhist that accordingly, would require a vegan diet.

321. The Sheriff's deputies instead brought meat and other foods inconsistent with Ms. Klotzer's religious beliefs.

322. As a result, for over 36 hours, Ms. Klotzer was unable to eat.

323. Ms. Klotzer was held for several days without seeing a judge. During his time, she was held in 23 hour lockdown.

324. She was charged with a park curfew violation.

325. This charge was later dropped.

326. The Denver police have never arrested someone for violating the park curfew. They ask people to leave and if necessary, they write a ticket.

327. That night, the Denver police used the park curfew to punish Ms. Klotzer for protesting and to deny him the right to protest during the following nights by imprisoning him.

328. The Sheriff's deputies, in fraternity with the Denver police, abused their discretion and punished Mr. Klotzer, a pretrial detainee, but placing him in solitary confinement and lockdown and denying him the opportunity to see a judge for several days.

### Joe Szuszwalak

329. On May 28, 2020, Joe Szuszwalak attended the George Floyd protests in downtown Denver.

330. While protesting, Mr. Szuszwalak was subjected to pepper spray and tear gas.

331. Mr. Szuszwalak ran to escape this chemical cloud and came upon a man how was kneeling on the ground, crying after having been pepper sprayed from point blank range.

332. Mr. Szuszwalak is a trained EMT.

333. As he was tending to this man, Mr. Szuszwalak was shot in the back several times with pepper balls.

334. It was clear that the police were targeting him because he was a medic.

335. Mr. Szuszwalak came out again on May 30, 2020 to participate in the protests.

336. Mr. Szuszwalak kneeled with other protesters and chanted "Hands up, don't shoot."

337. The police shot their munitions at these protesters.

338. As a result, Mr. Szuszwalak sustained serious pain from the chemical attack and abrasions and bruises.

339. At no time did Mr. Szuszwalak commit any crime, resist arrest, threaten any person, or destroy any property.

340. Nonetheless, Mr. Szuszwalak was subjected to significant use of force simply for protesting.

<u>**STATEMENT OF CLAIMS FOR RELIEF**</u>

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourth Amendment Violation — Excessive Force**
**(All Plaintiffs against All Defendants)**

341. Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs, as though fully set forth herein.

342. Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers for the DPD at all times relevant to the allegations in this Complaint.

343. Defendants are "persons" under 42 U.S.C. § 1983.

344. Plaintiffs had a protected Fourth Amendment interest against being victimized by the use of excessive force at the hands of law enforcement personnel.

345. Defendants did not have, at any time, a legally valid basis to seize Plaintiffs.

346. Defendants unlawfully seized Plaintiffs by means of excessive physical force, including the use of chemical agents and KIPs.

347. Defendants had no warrant authorizing any seizure of Plaintiffs.

348. Each Defendant failed to intervene to prevent the other Defendants from violating Plaintiffs' constitutional rights and is thereby liable for such failure to intervene.

349. Defendants' actions were objectively unreasonable in light of the circumstances confronting them.

350. Plaintiffs had committed no crime (nor could any of the Defendants have reasonably believed they had committed any crime) that would legally justify arrest or detention, Plaintiffs gave the officers no reason to fear for their safety, Plaintiffs were obviously unarmed, and Plaintiffs were not resisting arrest or fleeing.

351. Defendants did not have a legally valid basis to seize Plaintiffs in the manner and with the level of force used under the circumstances presented.

352. Defendants recklessly created the situation in which they used force.

353. Defendants' actions, as described herein, were objectively unreasonable in light of the facts and circumstances confronting them.

354. At the time when Defendants used excessive force against Plaintiffs, Plaintiffs had a clearly established constitutional right under the Fourth Amendment to the United States Constitution to be secure from unreasonable seizure through excessive force. Any reasonable law enforcement officer knew or should have known of this clearly established right.

355. Defendants engaged in these actions intentionally, willfully, and wantonly,

54

demonstrating deliberate indifference to, and a reckless disregard for, Plaintiffs' constitutionally protected rights.

356.    Defendant Denver has a custom, practice, or policy of tolerating violations of the Fourth Amendment of the United States Constitution.

357.    The actions of the Defendants were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Defendant Denver, including Chief Pazen and Defendant Phelan.

358.    Defendant Denver's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind Defendants' violation of Plaintiffs' constitutional rights.

359.    Defendant Denver, Chief Pazen, and Defendant Phelan failed to properly supervise and/or train its officers.

360.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described herein, Plaintiffs suffered injuries, damages, and losses.

361.    Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiffs' injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiffs suffered during and after the vigil, and other compensatory and special damages.

362.    Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiffs of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourteenth Amendment Violation — Excessive Force**
**(All Plaintiffs against All Defendants)**

363.    Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs, as though fully set forth herein.

364.    Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers for the DPD at all times relevant to the allegations in this Complaint.

365.    Defendants are "persons" under 42 U.S.C. § 1983.

366.    Plaintiffs had a protected Fourteenth Amendment Substantive Due Process interest against being unreasonably harmed by the use of excessive force at the hands of law enforcement personnel.

367.    Defendants did not have, at any time, a legally valid basis to use force against Plaintiffs.

368.    Defendants' use of force was extremely disproportionate.

369.    Defendants acted with malice and/or excessive zeal amounting to an abuse of power.

370.    Defendants acted for the purpose of causing harm unrelated and unnecessary to any relevant policing objective.

371.    Defendants' actions were arbitrary and/or conscience shocking in light of the circumstances confronting them.

372.    Defendants failed to intervene to prevent each Defendant from violating Plaintiffs' constitutional rights.

373.    Defendants engaged in these actions intentionally, willfully, and wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiffs' constitutionally protected rights.

374.  At the time when Defendants used excessive force against Plaintiffs, Plaintiffs had a clearly established constitutional right under the Fourteenth Amendment to the United States Constitution to be secure from excessive force. Any reasonable law enforcement officer knew or should have known of this clearly established right.

375.  The actions of the Defendants were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Defendant Denver, including Chief Pazen and Commander Phelan.

376.  Defendant Denver's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind Defendants' violation of Plaintiffs' constitutional rights.

377.  Defendants Denver, Chief Pazen, and Commander Phelan failed to properly supervise and/or train its officers.

378.  As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiffs suffered injuries, damages, and losses.

379.  Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiffs' injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiffs suffered during and after the vigil, and other compensatory and special damages.

380.  Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiffs of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**First Amendment Violation — Freedom of Speech and Assembly**
**(Plaintiffs Marquis Dominick, Brett Rios, Tashari Sellers, Raymond Schwab, Jesse**
**Friedman, Susan McKillips, Ryan Kehoe, Adam Bentch, Patricia Koo, Isis**
**Usborne, Kristen Klotzer, and Joe Sazuszwala against All Defendants)**

381.    Plaintiffs incorporate by reference the allegations contained in the foregoing
paragraphs, as though fully set forth herein.

382.    Defendants, acted under color of state law, and within the course and scope of their
employment, in their capacities as officers of the DPD at all times relevant to the
allegations in this Complaint.

383.    Defendants are "persons" under 42 U.S.C. § 1983.

384.    Plaintiffs were engaged in First Amendment-protected expression by gathering to
protest police brutality.

385.    The actions of Defendants – specifically, the use of excessive force against peaceful
protesters – would chill a reasonable person from engaging in activity protected by the
First Amendment.

386.    Plaintiffs' expressions were on a matter of public concern and did not violate any law.

387.    Plaintiffs' expressions occurred in a traditional public forum.

388.    Defendants' actions were a content-based and/or viewpoint-based restriction of
Plaintiffs' expressions.

389.    Defendants' actions were not a reasonable time, place, and manner restriction on
speech.

390.    Defendants, collectively, failed to intervene to prevent each Defendant from violating
Plaintiffs' constitutional rights.

391.    At the time when Defendants stopped Plaintiffs from speaking and gathering, Plaintiffs had a clearly established constitutional right under the First Amendment to the United States Constitution to gather, express themselves, and speak freely. Any reasonable law enforcement officer knew or should have known of this clearly established right.

392.    Defendants engaged in their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiffs' constitutional rights.

393.    Defendants stopped Plaintiffs from engaging in expressive activity in accordance with the customs, policies, and practices of Defendant Denver.

394.    Defendant Denver has a custom, practice or policy of tolerating violations of the First Amendment of the United States Constitution.

395.    The actions of the Defendants were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Defendant Denver, including Chief Pazen and Commander Phelan.

396.    Defendant Denver's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind Defendants' violation of Plaintiffs' constitutional rights.

397.    Defendants Denver, Chief Pazen, and Commander Phelan failed to properly supervise and/or train its officers.

398.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiffs suffered injuries, damages, and losses.

399.    Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiffs' injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain, and

anguish Plaintiffs suffered during and after the protest, and other compensatory and special damages.

400.    Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiffs of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

## FOURTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### First Amendment Violation — Retaliation
**(Plaintiffs Marquis Dominick, Brett Rios, Tashari Sellers, Raymond Schwab, Jesse Friedman, Susan McKillips, Ryan Kehoe, Adam Bentch, Patricia Koo, Isis Usborne, Kristen Klotzer, and Joe Sazuszwala against All Defendants)**

401.    Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs, as though fully set forth herein.

402.    Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers for the DPD at all times relevant to the allegations in this Complaint.

403.    Defendants are "persons" under 42 U.S.C. § 1983.

404.    Plaintiffs were engaged in First Amendment-protected expression by gathering to protest police brutality.

405.    The actions of Defendants – specifically, the use of excessive force against peaceful protesters – would chill a reasonable person from engaging in activity protected by the First Amendment.

406.    Plaintiffs' expression was on a matter of public concern and did not violate any law.

407.    Plaintiffs' expression occurred in a traditional public forum.

408.    Defendants jointly and on their own accord responded to Plaintiffs' First Amendment

protected activity with retaliation, including but not limited to use of physical force, including KIPs and chemical agents.

409. By unlawfully using force against Plaintiffs, Defendants sought to punish Plaintiffs for exercising their First Amendment rights, to silence them, and to deter them from gathering and speaking in the future. Defendants' retaliatory actions would chill a person of ordinary firmness from engaging in such First Amendment protected activity.

410. Defendants' retaliatory actions were substantially motivated by Plaintiffs' exercise of his First Amendment rights.

411. At the time when Defendants retaliated against Plaintiffs for exercising their First Amendment rights, Plaintiffs had a clearly established constitutional right under the First Amendment to the United States Constitution to be free from retaliation. Any reasonable law enforcement officer knew or should have known of this clearly established right.

412. Defendants, collectively, failed to intervene to prevent each Defendant from violating Plaintiffs' constitutional rights.

413. Defendants engaged in their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiffs' constitutional rights.

414. Defendants stopped Plaintiffs from engaging in expressive activity in accordance with the customs, policies, and practices of Defendant Denver.

415. Defendant Denver has a custom, practice or policy of tolerating its officers' retaliatory violations of the First Amendment of the United States Constitution.

416. Defendants Denver, Chief Pazen, and Commander Phelan failed to properly supervise and/or train its officers.

417.   The actions of Defendants were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Defendant Denver, including Chief Pazen and Commander Phelan.

418.   Defendant Denver's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind Defendants' violation of Plaintiffs' constitutional rights.

419.   As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiffs suffered injuries, damages, and losses.

420.   Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiffs' injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiffs suffered during and after the protest, and other compensatory and special damages.

421.   Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiffs of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

## FIFTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### Fourteenth Amendment Violation — Procedural Due Process
**(Plaintiffs Marquis Dominick, Brett Rios, Tashari Sellers, Raymond Schwab, Jesse Friedman, Susan McKillips, Ryan Kehoe, Adam Bentch, Patricia Koo, Isis Usborne, Kristen Klotzer, and Joe Sazuszwala against All Defendants)**

422.   Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs, as though fully set forth herein.

423.   Defendants acted under color of state law, and within the course and scope of their

employment, in their capacities as law enforcement officers for the DPD at all times relevant to the allegations in this Complaint.

424.    Defendants are "persons" under 42 U.S.C. § 1983.

425.    The due process rights of Plaintiffs were violated when Defendants failed to provide any warning about the deployment of KIPs, to provide an opportunity to disperse, to leave open routes of egress, and to enforce the laws of the City of Denver and State of Colorado in a way that a person of ordinary intelligence could understand and comply with them.

426.    Defendants' use of force during the protests was inflicted based on the unbridled discretion of individual police officers, and was in no way guided by any published law or legal authority that would provide a person of ordinary intelligence with a reasonable opportunity to understand what conduct is permitted and prohibited, or what conduct would result in the use of force.

427.    Denver's customs, policies, and practices relating to the use of force during the protests permitted use of force at the unbridled discretion of an individual police officer, without adequate notice or an adequate opportunity to comply, in a way that does not provide a person of ordinary intelligence with a reasonable opportunity to understand what conduct is permitted and prohibited, and in a way that authorizes and encourages discrimination based on the content of the message of a person engaged in expressive activity.

428.    Plaintiffs reasonably fear further violation of the right to due process in the future if they participate in protest activity.

429.    At the time when Defendants violated Plaintiffs' due process rights, Plaintiffs had a

clearly established constitutional right under the Fourteenth Amendment to the United

States Constitution to be afforded due process of law. Any reasonable law enforcement

officer knew or should have known of this clearly established right.

430.    Defendants engaged in these actions intentionally, willfully, and wantonly,

demonstrating deliberate indifference to, and a reckless disregard for, Plaintiffs'

constitutionally protected rights.

431.    The actions of the Defendants were authorized (before and during the fact), and ratified

(after the fact), by final policymakers for Defendant Denver, including Chief Pazen and

Commander Phelan.

432.    Defendant Denver's customs, policies, and/or practices, and the decisions of its final

policymakers, were the moving force behind Defendants' violation of Plaintiffs'

constitutional rights.

433.    Defendants Denver, Chief Pazen, and Commander Phelan failed to properly supervise

and/or train its officers.

434.    Defendants' intentional actions or inactions as described herein intentionally deprived

Plaintiffs of due process and of rights, privileges, liberties, and immunities secured by

the Constitution of the United States of America.

435.    Defendants' herein described acts or omissions were the moving force and the legal,

direct, and proximate cause of Plaintiffs' injuries and losses, including but not limited

to non-economic damages, economic damages, the physical and mental pain and

anguish Plaintiffs suffered during and after the vigil, and other compensatory and

special damages.

436.    Defendants' intentional actions or inactions as described herein intentionally deprived

Plaintiffs of due process and of rights, privileges, liberties, and immunities secured by

the Constitution of the United States of America.

### SIXTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### Fourth Amendment Violation — Failure to Train or Supervise
### (All Plaintiffs against Defendants Denver, Pazen, and Phelan)

437. Plaintiffs incorporate by reference the allegations contained in the foregoing

paragraphs, as though fully set forth herein.

438. Defendants acted under color of state law, and within the course and scope of their

employment, in their capacities as law enforcement officers for the DPD at all times

relevant to the allegations in this Complaint.

439. Defendants are "persons" under 42 U.S.C. § 1983.

440. Plaintiffs had a protected Fourth Amendment interest against being victimized by the

use of excessive force at the hands of law enforcement personnel.

441. Defendants did not have, at any time, a legally valid basis to seize Plaintiffs.

442. Defendants unlawfully seized Plaintiffs by means of excessive physical force,

including the use of chemical agents and KIPs.

443. Defendants Denver, Pazen, and Phelan had an obligation to ensure that their officers

were properly trained in responding to First Amendment activity, including criticism

of officers, and the use of less lethal munitions.

444. Defendants Denver, Pazen, and Phelan were made aware over the course of several

evenings that DPD officers were using less lethal munitions, including rubber bullets,

in a retaliatory manner.

445. Defendants Denver, Pazen, and Phelan were made aware over the course of several

evenings that DPD officers were using less lethal munitions, including rubber bullets,

in a dangerous manner, often aiming for heads and seeking to inflict the maximum damage possible on protesters.

446.    Defendants Denver, Pazen, and Phalen had a duty to the citizens of Denver and the protesters to stop the use of excessive and often deadly force against protesters who were not threatening any bodily harm.

447.    Defendants Denver, Pazen, and Phalen failed to train their officers in the use of these less lethal munitions and in how to respond to protest movements.

448.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiffs suffered injuries, damages, and losses.

449.    Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiffs' injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiffs suffered during and after the protest, and other compensatory and special damages.

450.    Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiffs of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

**SEVENTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourteenth Amendment Violation — Equal Protection**
**(Plaintiff Alex Hickman against John Doe Defendants)**

451.    Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs, as though fully set forth herein.

452.    Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers for the DPD at all times

relevant to the allegations in this Complaint.

453. Defendants are "persons" under 42 U.S.C. § 1983.

454. Plaintiff had a protected Fourteenth Amendment interest against being discriminated against on the basis of his race.

455. Plaintiff is a Black man and is a member of a protected class.

456. Defendants did not have, at any time, a legally valid basis to seize Plaintiff.

457. Defendants unlawfully seized Plaintiff by means of excessive physical force, including the use of chemical agents and KIPs.

458. John Doe Defendants shot Plaintiff with a KIP on the basis of his race.

459. Defendants possessed no compelling interest in the use of race on a discriminatory basis.

460. As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses.

461. Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered during and after the protest, and other compensatory and special damages.

462. Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

## EIGHTH CLAIM FOR RELIEF
## 42 U.S.C. § 1983
### Fourteenth Amendment Violation — Equal Protection – Selective Enforcement
### (Plaintiffs Kristen Klotzer and Tashari Sellers against Defendant Denver and John Doe Defendants)

463.   Plaintiffs incorporates by reference the allegations contained in the foregoing paragraphs, as though fully set forth herein.

464.   Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers for the DPD at all times relevant to the allegations in this Complaint.

465.   Defendant are "persons" under 42 U.S.C. § 1983.

466.   Plaintiffs were arrested for their First Amendment activity when other similarly situated individuals have never been arrested under the park curfew law.

467.   The officers' discriminatory intent was the motivating factor in Plaintiffs' arrests.

468.   As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiffs suffered injuries, damages, and losses.

469.   Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiffs' injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiffs suffered during and after the protest, and other compensatory and special damages.

470.   Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiffs of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in his favor and against each Defendant, and award him all relief allowed by law, including but not limited to the following:

A. All appropriate relief at law and equity;

B. Declaratory relief and other appropriate equitable relief;

C. Economic losses on all claims as allowed by law;

D. Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

E. Punitive damages on all claims allowed by law and in an amount to be determined at trial;

F. Attorneys' fees and the costs associated with this action under 42 U.S.C. § 1988, including expert witness fees, on all claims allowed by law;

G. Pre-and post-judgment interest at the lawful rate; and

H. Any other appropriate relief at law and equity that this Court deems just and proper.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this 27th day of May 2022.

s/ Edward Milo Schwab
Edward Milo Schwab, #47897
Ascend Counsel, LLC
2401 S. Downing Street
Denver, CO 80210
(303) 888-4407
milo@ascendcounsel.co

ATTORNEY FOR PLAINTIFF